We'll hear first this morning Case 17-155, Hughes v. United States. Mr. Chomsky. Mr. Chief Justice, and may it please the Court, the plurality and the concurrence in Freeman recognized two ways that a sentence following a C-type agreement can be based on the guidelines. Both are correct. Now, those opinions differed in their reasoning, such that Freeman itself has no precedential effect under Marx, but the two approaches can be united under a common umbrella, namely, longstanding principles of proximate and multiple causation, and that's because each form of guidelines reliance bears a close connection to the sentence. The first Mr. Chomsky, could you address one issue for me on this question? In a C agreement, the government is giving up often certain things. Sometimes they dismiss additional charges. Sometimes, as here, they give up filing a persistent felony certificate. Sometimes they agree not to prosecute someone important to the defendant. There are many things that go into that bargain. How is a district court judge to determine whether a departure from the guideline range is justified? In what circumstances is what the government giving up valuable enough to keep the original deal, and when is it not? Justice Sotomayor, let me answer the question in two parts, if I can. First of all, those conditions, the way Your Honor describes C-type agreements, are true also for B-type agreements and for the sort of C-type agreements that the government concedes open the door to eligibility for relief under 3582C2. So this particular category of C-type agreement that the government is proposing to carve out is not different in that way than all of these other categories of agreements. This is not the case. Sotomayor, let's take dismissing charges, I think it could be seen as relatively easy, how different were the charges and the exposure from what was capped and what was the strength of the government's evidence. And the government could talk about that at sentencing, on those charges. But the persistent felony offender certificate is a different judgment, which is I, the government think that a sentence of X amount justifies giving up that certificate. How would a district court make up for the loss of that belief by the government? Well, Justice Sotomayor, let me push back a little bit still on the first part of my answer and then get to the second part. Again, that's no different than in a C-type agreement in which there is a range defined by the guidelines, and the government agrees that those sentences are eligible for relief under 3582c2. The only difference there is that rather than a number potentially moving a bit, a range will move a bit. So again, I don't think it's categorically different in that way. But to answer the second part of the question, the district court judge exercising her or his discretion will apply the 3553a factors just like they do in a C-type agreement or in any other case where there is a request for discretionary relief under 3582c2. Remember that this is only a question of eligibility. It's not a guarantee of relief. It just enables the case ordinarily to go back to the very same district court judge who is the one who approved the agreement in the first place and determine whether under the circumstances, again, the 3553a circumstances, some adjustment is appropriate. Sotomayor, when wouldn't any? What would disqualify a defendant from eligibility? The plurality said this determination has to be made on a case-by-case basis. But as I read your brief, I can't — what are the scenarios where you think someone would not be eligible? Let me answer. Again, in two ways, and again, maybe in exactly the same two ways, this is no different than any other sentencing determination in the sense that it is predicated on the 3553a factors. And so we read the transcript, government comes in under a C agreement where it says we are not recommending a guideline sentence. We want to deviate from it because we think he cooperated, but not enough to be substantial. He has an ill child, whatever the reasons are. We think a lower sentence is appropriate. And this is the sentence we picked. Would that defendant under your reading still be eligible to go back to the district court for reconsideration? Well, just to clarify, Your Honor, if it is a sentence under 1B1.10 cannot drop below the bottom of an amended guidelines range, so that there is a floor on how much the movement can be, but again, it will simply be the district court considering all of the 35. So are you conceding there's no — you can't imagine a scenario where someone wouldn't be eligible? No, Your Honor. I'm sorry. Perhaps I misunderstood the question. In a circumstance, for instance, under which the district court says, using the discretion that it has post Booker under cases like Gall and Spears, the district court says, I'm not applying the guidelines at all. I disagree with the guidelines as a policy matter. Under those circumstances, it's very hard to see how in any ordinary meaning of the term a sentence is based on the guidelines. But absent circumstances like those, ordinarily a sentence will be based on the guidelines, and that only makes sense. This Court has said over and over and over post Booker in cases like Gall and Pew and most recently in Melina Martinez that sentences are ordinarily based on the guidelines, and so it won't be surprising if indeed a district court concludes that that's what occurs. Not only is a sentence bargained for in the shadow of the guidelines, as the concurrence in Freeman put it, that is where the parties start. The United States Attorney's Manual directs prosecutors not just to charge, but to make plea bargaining determinations consistent with the guidelines. Defense attorneys do exactly the same thing. When they sit down with their client for the first time, they look at the guidelines and say, here's what you're looking at. And so it shouldn't be surprising that ordinarily, other than in the sort of relatively extreme circumstances I was alluding to a moment ago, sentences indeed will be based on the guidelines. Roberts. The first question we posed was how to apply marks to this situation, and I'm wondering if I'm a court of appeals judge, it seems to me the most important thing in deciding the case is to make sure that I'm not reversed. And it seems to me the best way to do that is through the, whatever you want to call it, the walking through, sort of counting out what would happen if you count where the different votes are. And it seems to me if you take any other approach, you're subject to reversal, because by definition, a majority of the court here would reach a different result. I would say a couple of things about that, Mr. Chief Justice. First of all, marks focuses on the holding or the judgment of the court. And so under marks, what we're trying to figure out is whether there's precedent. Ordinarily, only a court's holding qualifies as precedent, and a holding is the reasoning that's necessary to support the judgment. The government's alternate approach, its run-the-facts-through-the-opinions approach, first of all, I'm not sure it even purports to be an application of marks in that sense. Second of all, it is predicated upon counting dissenting votes, and marks itself says quite specifically that that's not what marks is about. Marks talks about the position taken by those members who concurred in the judgments. And O'Dell at page 160 speaks in similar terms, votes necessary to the judgment. Well, that is a practical – as a practical matter, though, in a particular case, that would have the court of appeals writing an opinion that would be subject to reversal. And that, Mr. Chief Justice, is the other thing I was going to say. I think that the way you put it a moment ago in asking the question is that a lower court would be wise to look at what the opinions say, and of course it would be. The same way that lower courts are wise to look at this Court's dicta, to look at concurring opinions. Ginsburg-Gilliann And why should they – why should they pretend that this Court had an opinion that counts as precedent? They can say, all right, we see four justices thought this, two justices thought that, and we're going to read those opinions and then give our best judgment of what the right answer is without being bound by a minority of the justices. Justice Ginsburg, that – we think that that is exactly correct. A lower court is wise to pay attention to the votes of justices, but that is a very different question than whether there is binding precedent. And here, what the Eleventh Circuit concluded was simply that it had to follow the concurring opinion in Freeman, that it was the vote of one justice was the law of the land, notwithstanding the fact that eight justices had sharply disagreed with that reasoning. And so, Justice Ginsburg, we think that that's not right. Now, to be clear, a lower court could say, I am going to count votes, I am going to predict what the Supreme Court might do, but I think that a slightly different hypothetical points out the difficulty with this. Mr. Chief Justice, if you imagine instead of a case that comes right back up to a nearly identically constituted court on the exact same question, 15 years have passed or 20 years have passed, it would be quite strange under those circumstances for a court to engage in that same kind of nose counting and say, well, because that one justice 20 years ago thought this thing, that is the only decision we can reach. Well, Marx has been the law for 40 years, and for better or worse, it has had a big effect, I think, on what we have understood to be the jurisprudence of this Court and what the lower courts have understood to be our precedents and on the way in which justices of this Court go about doing their job. And if we abandon anything like Marx, perhaps it requires — it certainly could benefit from some clarification and maybe some refinement, but if we abandon it completely, it could have pretty profound changes. Why should we do that? Justice Alito, our first argument, of course, is that the Court should refine Marx, and we think that the logical subset test, or as this Court put it, in Nichols, looking for a common denominator, is the most sensible way to do that, consistent with the norms about precedent and holdings that I was alluding to earlier. Let me— Alito, Professor Ray wrote an interesting amicus brief in this case, arguing that the logical subset approach is illogical. And I think there might be something to that. Let me give you this example. Let's say that nine people are deciding which movie to go and see, and four of them want to see a romantic comedy, and two of them want to see a romantic comedy in French, and four of them want to see a mystery. Now, is the — are the two who want to see the romantic comedy in French, is that a logical subset of those who want to see a romantic comedy? Justice Alito, the answer is it depends, and those people could say what their view about that is. And so just— Well, suppose we know nothing more than that. Then it is a fair presumption, at least under certain circumstances. I can't speak to romantic comedies in French, but there are a couple of this Court's precedents under which, contrary to what Professor Ray has said, logical subsets do in fact make a great sense — a great deal of sense. If not all the time, then nearly all the time. And if that's a logical subset, I think there's a serious problem with the argument, because the four who want to see a romantic comedy might think, I don't want to see anything in a foreign language, particularly in French. I'd rather go see a mystery or something else. So, Justice Alito, and I think this is the key to the puzzle, any time two people, be they justices of this Court or people going to see a romantic comedy, can say, here's how far I go, but I don't agree with that thing over there. And so sometimes we see justices saying, I take an absolutist view, and anything less than that is legally wrong. And under those circumstances, we would know what those justices think, and of course, justices would have, like they always have, the prerogative to articulate how far their view goes and whether something less makes sense. But at least as a way of understanding — JUSTICE ALITO I'm sorry, but that means that you would want them to engage in dicta. In other words, you're saying, let's say someone has an absolute view of the First Amendment, you can't have any restraints at all, and a concurring opinion says, well, I agree with that, except when it comes to, you know, communists, then I think they shouldn't have the right to speak. And you don't know that the people who think there's an absolute right may say, well, it's absolute, but if you're going to carve out anybody, you've got to carve out everybody. And what you're suggesting is that to make things clear for the courts of appeals down the road, those justices should talk about these hypothetical cases, about how they would apply the rule in the event, you know, that this or that happens. And I wonder if that's more problematic than the difficulties you have with just sort of the counting through approach. I don't think it is, Your Honor. The point is simply that justices have the prerogative, like they always do, to articulate how far their rule goes. But I do want to make sure, Justice Alito, to get to at least a couple of examples that demonstrate that the logical subset, while it may be imperfect like all of these rules are, at least has some significant utility contrary to what Professor Wray said. So if you look at a case like Ford that was interpreted in Panetti, you have a plurality of justices saying we require full competency proceedings with all of the hallmarks of a trial, and Justice Powell writing separately saying something less than that is enough, we don't need cross-examination, we don't need live witnesses, there it's pretty fair to say that the lesser version is included within the broader version that the plurality would have wanted. Or in a case like Caldwell. Sotomayor, that's covered by Marx automatically. I'm not sure what it means to say that something is covered. Meaning Marx says what's the narrowest holding of a plurality in a concurrence, and under that interpretation, the literal interpretation of Marx, your situation is covered. We're talking about a situation where the reasoning doesn't necessarily overlap completely. Watts Again, two points, Justice Sotomayor. I think that the language of narrowest in Marx is, frankly, part of the problem here, and that is the strength of what Professor Wray has said. Whatever guidance Marx may have provided, it's probably caused more confusion than it's gotten. Sotomayor Why is the confusion necessarily so evil? Meaning the government makes the counterpoint which says you want something to follow a split decision by the court. You want some even-handed, predictable and consistent development of the law, at least on some level. And even if there's some confusion, there is some predictability that's going on. Under the Wray test, there isn't any. It's as if the decision was made and nothing has happened, because we're still sending it back for the lower courts to be without real guidance. Watts I think the strength of Professor Wray's view, Justice Sotomayor, is that the current situation is not, in fact, providing much, if any, guidance. And at pages 16 to 17 of his amicus brief and in the underlying paper, he lays out innumerable circuit splits that have resulted from efforts to attempt to apply the Marx rule. And so the idea would be simply that. Kagan I'm sorry. Please continue. Watts Well, simply that to return to the older historical norm of actual majority rule would provide clarity, and absent that, percolation could occur in the lower courts, which would aid this Court in its ultimate decision-making. Kagan The question is, what is the second best? We're in a world in which the first best option, which is five people agreeing on the reasoning, that doesn't exist. And so everything else is going to be, is going to have some kind of problem attached to it, and we're really picking among problems. I guess what I wonder is why you say the solution that we should pick is just a solution in which this Court is giving no guidance, and courts are out there on their own and doing their own thing, and splitting with each other, dividing with each other, not having any way to resolve these cases, which sounds like chaos to me. And what the government says is, look, this isn't the best approach, but it's the second best approach, is if you don't have common reasoning, just ask about results. And if you can look at a case and know that there are five justices on the Supreme Court who think X rather than Y, then you should go with X. And we can talk about how that counts dissenting votes, or, you know, give various theoretical objections to that. But in the end, we do try to get to five here. We know how to get to five in some of these cases, even if the five depend on different reasoning. Why isn't that just the second best approach? So just to clarify, if I may, Justice Kagan, and then to turn to that, our position is not that there should be chaos, nor at least in the first instance, that the Ray argument is the best one. Logical subset or common denominator, as the D.C. Circuit put it in King v. McCormack is... Kagan Well, you carve out a set of cases. And then when it's not completely nested in the way that you want it to be, you vote for chaos. And I guess I'm asking, why vote for chaos in all of these cases or even in some of these cases. So to be clear, Justice Kagan, and I don't want to quibble, but I mean, the idea is not that it's chaos. It's that the lower courts can then percolate the issue, as this Court often invites them to do. But let me... Sorry, let me turn to the question about the running the facts through the opinions approach. I mean, it is not just a secondary concern that that relies on dissent. That is quite contrary to everything that this Court has said for not just decades, but hundreds of years about how to identify precedents and holdings. If dicta is not precedent, it doesn't count as part of the holding of the Court, then surely that votes that aren't even necessary to the judgment... Kagan Well, Mr. Chomsky, I think your approach relies on dissent sometimes, too. Because take one of these logical subset cases. You have a concurrence that is a logical subset of the plurality, and you say, well, the concurrence controls, and that's true even as to times where the concurrence splits off with the plurality and joins with the dissent. So you're counting dissents, too, I think. Chomsky To be very clear about this, Your Honor, that is not our position, that the concurring opinion would only be given force insofar as or to the extent that it is an opinion that is necessary to the judgment. But I do want to... Kagan It's necessary to the judgment, but the result of applying the plurality would grant relief in this much, this many cases. The concurrence would grant relief in many fewer cases and deny relief in lots of cases where the dissent would also deny relief. So by privileging the concurrence, you're essentially saying that when the concurrence agrees with the dissent, the concurrence wins, which I take it is a way, is, is, is because the concurrence plus the dissent equals 5. Chomsky I don't think so, Justice Kagan, and, Justice Sotomayor, I think this gets back to a question that you were asking earlier. If the Venn diagrams overlap, if the Russian dolls don't fit, then under those circumstances it's not a logical subset. Kagan I'm talking about a case in which it is completely nested, but the con, but it is completely nested, but the concurrence is sometimes granting the relief that the plurality would, but sometimes, instead, reaching the result the dissent would. And by saying the concurrence controls, in those cases, you're giving effect to the times when the concurrence plus the dissent equals 5. Chomsky I think that for the same reasons I was indicating about reliance on, about the importance of holdings, we would not say that it controls under those circumstances. Now, perhaps the next case might come up, and there would be an opportunity to evaluate that. But, Justice Kagan, I want to make sure to answer the question. Kagan So in those circumstances, there is no result? Chomsky Well, there would be a bare result, certainly, but the concurrence would not be controlling as to cases in which it has to be paired with the dissent. I want to make sure to answer directly your question, Justice Kagan, about what's wrong with the government's approach, and then I might try and turn back to the 3582 question for a moment, if I can. What is wrong with the government's approach is not just that it is contrary to these pretty fundamental notions about precedent and holdings, but because it would stunt the development of the law. It would say at precisely the moment at which this Court is unable to reach a majority, the lower courts should stop trying to sort these issues out. We should stop hoping that we can get to an actual result, whether because of the coming together of the lower courts or because a justice changes their mind or a justice  Sotomayor I'm sorry. Why is the development of the law stunted completely? You tell us that there is confusion in a split, which suggests to me that the split is occasioned likely in part by the circuit's view of the persuasiveness of the split, of some other side's arguments on the split. So it's not, I don't think necessarily that it stifles discussion in any meaningful way. You're just, you just don't, you say this kind of confusion I don't like. I think the point is a bit different, Justice Sotomayor, in the following way. The idea would be that once this Court splinters and when there is no middle ground, as the government puts it, at that point, all that is left for a lower court to do is run the facts through the opinions. You don't think about the issue further. You don't attempt to resolve it on the merits. You just plug things into the vote-counting algorithm and get bare results in bare cases. Alito Can I just ask you this quick question? Suppose that there is a majority of the Court that agrees that a particular party is entitled to relief, but there is no majority as to the provision of the Constitution that provides the relief. What happens in that situation? So that's never a precedent unless one of the two, and both of these groups, feel very strongly that the other is wrong in identifying the constitutional provision. So one of them has to give way or else this issue is never going to be resolved? I think that, and let me answer your question, Justice Alito, and then I'll turn to the rest of my time. I think that that is the quintessential case in which there is not precedent. If we have less than a majority of this Court resolving a question of constitutional import on different grounds, then it would be very strange to think that the constitutional issue has been resolved for all time. So the lower courts would then be free to deny relief in all these cases? In a case just like the one that had been before the Court, surely, and this goes to my answer to the Chief Justice, surely the lower courts would be wise to pay very little attention to all of the opinions of this Court, but if there is no majority on the question, then there is no precedent, if I can reserve the balance of my time. Thank you, counsel. Thank you. Ms. Kovner. Mr. Chief Justice, and may it please the Court, the circuit split here concerns the interpretation of the Marx rule, and this Court should decide this case by rejecting the view of the two circuits that treat divided decisions of this Court as entitled to no precedential effect, unless the separate opinions of this Court share the same reasoning. That approach is flatly contrary to what this Court said in Marx. It's contrary to how this Court has applied Marx, and it undercuts the principle of vertical stare decisis that generally requires lower courts to decide cases in the way that this Court would decide them. Now, I take Petitioner to raise two main objections to that. The first is an argument that Marx, as this Court has developed it, requires considering dissents. I do want to make clear that it's only true in a limited sense. When this Court applies the Marx doctrine, it's picking one of the opinions that led to the judgment in the case at hand and treating that judgment, treating that opinion as controlling. So it's the Marx. Ginsburg's opinion of only one. So let's take, I think, an illustration that's familiar. For years it was thought that Justice Powell's opinion in Bakke was controlling. That was a 4-4-1. And he was in the middle, but none of the others took the position that he did. So a single justice was thought to determine what this Court's precedent for the Marx was. That's right, Your Honor. I think that this Court has consistently applied Marx in that way by picking an opinion that's not subscribed to by the members, by all the members of the Court or by a majority, and describing that as the controlling opinion. And I think the reason, Justice Ginsburg, is that when the Court applies that opinion, it's not applying an opinion that leads to the result that's favored by only one member of the Court. It's applying an opinion that leads to the result that's favored by a majority of the Court. And in every application, the application of that opinion also is supported by the reasoning of a majority of members of this Court. Kagan. Kagan. Kagan. But it might not be. I mean, there are middle ground positions that, in a 4-1-4 case, where the 4 would say, well, if we can't get what we want, we'd rather have the middle ground position. But there are some cases where there are middle ground positions which seem utterly incoherent to anybody else, incoherent or maybe it's based on what you think is an impermissible criterion, or for some reason, the middle ground is the worst of all possible worlds. So how do you deal with those sorts of cases? So we think ordinarily that the opinions in the case itself will deal with that in the following sense. So to take Freeman as an example, there's, I think, a sort of broad opinion, an in-between opinion, and a narrow opinion. And it's true that some opinions in Freeman criticized the middle ground, but nevertheless, the plurality in Freeman voted with the concurrence to create a common result. I think if the plurality thought that it were intolerable to have that middle ground position control the day, the plurality could say, given that we can't have our rule, our second choice is the categorical rule on the other side, and could join that opinion. But we think the plurality indicated through its vote that that's not what it wanted to have happen. It wanted to join with the concurrence and have that control the day. Breyer. So how – look, I don't know what I'd write in this case. And the reason I would write, if we have to get to this issue, the reason I don't know is because I think law is part art and part science. And you learn in law school and thereafter how to read an opinion. There are no absolute rules. Marbury v. Madison, two-thirds of it is not necessary to the conclusion. So should we pay no attention to it? Huh. Of course we pay attention to it. And then I can cite five, but I won't, where it may be that on this matter there was a unanimous court, but nobody believes it because it wasn't, you see. And they all go off. And Powell, of course, is in part key because he had a sensible view. And the public, the lawyers, the clients, the other judges are the ones who tell us that over time. So if you ask me to write something better than Barks, I don't know what to say except what I just said, which will help nobody. So I think the question that lower courts are in need of guidance on in this case – But what guidance? I mean, what? You talk about the French movie. That was great. I mean, fine. I say, you mean they really don't want to see the Philadelphia story? They must be crazy. All right. But you see, if you have, of course, a real French comedy, fine. But suppose you have, well, to show off, Mr. Hulot's Holiday, you know? It's a comedy, but is it romantic? And I mean, that's what law is about. And now suddenly you want us to write a rule. They've done all right with Marks. Leave it alone. And say it, interpret it with common sense. So I agree with that, but I think there is one clarification that there's a circuit split on, and it would be helpful for this Court to resolve. There are two circuits that say, contrary to the views of other circuits, that you need to have not only shared results, which I think is wrong. Say they're wrong. That's right, Your Honor. Then they say what's right, and we don't tell them. No, I think the Court can say Marks. And I think the one thing that the Court can add to Marks, if it wants to provide further guidance, is that what the Marks rule is doing is it's achieving vertical stare decisis. It's a way of ensuring that lower courts decide cases in the manner that this Court would. And so to the extent that in a particular case there's difficulty in identifying one opinion as the narrowest, a thing that the courts can also do is run the facts of the case through multiple opinions and see whether the result that is achieved there is the result that's favored by a majority of the court. Of course, that's something this Court has done in applying Marks II. Sotomayor May I ask two questions? I don't want you to ignore the third question of the petition. But the first one is, if we are able to reach a majority in the Freeman question, should we reach the Marks inquiry, and if so, how, and why? I mean, we usually do. It would be pure dicta. I think that's right, Your Honor. And so the Court, I think, has a choice about how it wants to resolve this case. And we would urge the Court to resolve the case on the Marks ground, because that is where there is a circuit split. There's no division on Freeman aside from just a question of the underlying Marks question of do you need common reasoning or only common results. So that's really the issue that's divided the lower courts. And the second sort of reason that relates to that, Your Honor, is Freeman itself is a statutory interpretation question that this Court, you know, we obviously took a broader position than Your Honor's opinion in Freeman, but this Court resolved that issue. It's essentially an issue for how the parties are going to bargain. So the parties have arranged their expectations in subsequent cases, including this one, around the understanding that Freeman provided a rule for how their plea agreements are going to be interpreted. Sotomayor, and what the prosecutors are now doing is making a waiver of any amendment of the guidelines in almost all C agreements. I don't think that's the case empirically, Your Honor. I think that for the most part, prosecutors have been understanding that Freeman is the rule, and we haven't seen, to my knowledge, the vast majority of districts actually incorporate those kinds of waivers. Sotomayor, I have a question on the substance of the plurality's position. There is some force to the argument that – and examples provided in the briefing – where the government goes to sentencing and says, we did this in light of the guidelines. And under the concurrence in Freeman, that would not count. Is that right? And why is that right? If the prosecutor is telling the judge, I'm doing this because of the guidelines, what difference does it make that it's in the plea agreement or not? It's still a representation by the government. That's right, Your Honor. I think that once Freeman was established, we can expect the parties to negotiate around the rule in Freeman. And so to the extent that the parties have an understanding that this is a sentence based on the guidelines within the meaning of Your Honor's opinion in Freeman, that's something they know that they should be putting in the plea agreement. And we think that it's desirable to have that one place to look for where the party's understanding is, rather than sort of combing through the background negotiations of the parties. Sotomayor, except the plurality says there's a player that you're not considering, which is the judge. And the judge accepts the agreement because a prosecutor has gotten up and said, we think it should be within the guidelines. It's not in the plea agreement, but the prosecutor is guiding the judge and incentivizing the judge to accept this agreement with that representation. So why shouldn't that be recognized? So I think, you know, both Your Honor's opinion in Freeman and the dissenting opinion in Freeman sort of note that there's a real difference between background considerations that go into what the deal is and then what the sort of deal ultimately is. Ultimately, in a C agreement, you know, the parties bargain for a specific determinate sentence, and they urge the court to impose that sentence. And that is, as, you know, Your Honor's opinion indicated and four other justices agreed, that is what the sentence is based on. And if there's doubt about that, I think there are a few things that the court can look to to resolve that doubt. The first is the Sentencing Commission's guidance. The Sentencing Commission's guidance indicates that the only guidelines that should be changed through 3582 are the guidelines that were actually applied when the defendant was sentenced. And that's surely not what happens in a C case. And the other, I think, is sort of reasons of administrability that Your Honor's opinion alludes to in Freeman. The alternative is on Petitioner's approach, you're going to be combing through the record to see whether in a particular case the guidelines bore a sufficiently close connection to the sentence. That's not an administrable inquiry. And then on the back end, as Your Honor's opinion alludes to in Freeman, you're going to have a judge trying to determine after the fact what is the alternative agreement that this part, the parties, would have entered into if the guidelines have been different. And that's not the kind of thing that's the way I phrased the question earlier, but really the question is not what will the parties do. The question really is what will I do? I mean, because every C agreement before it takes effect has to be approved by the judge. So really it's the judge who has to determine would I have accepted this or not, knowing that the guideline was in error. Kagan. I actually think that's the way in which a C plea is fundamentally different from other kinds of pleas, as Your Honor's opinion in Freeman alludes to, which is part of a C plea is that the parties agreed to it. And so if a judge said I'm not going to accept this plea, you'd be back to the drawing board for the parties. And so that's why Petitioner's approach means the judge has to figure out, okay, if the judge said no, what would the parties have done under that circumstance? And as Your Honor alluded to in your questions, often the government has given up, for instance, a mandatory minimum, you know, additional charges. You know, in this case, I think there's no reason to think that the government would have agreed to a more favorable deal if the guidelines had been different.  Breyer. In a C agreement, it says, the commission, that the judge, it's the judge who will depart, if that's the agreement, and it says the he has to write his reasons in writing as to why the agreed sentence departs from the applicable guideline range for justifiable reasons. So if the guideline range is 120 months, he says why it departs from that, and he has some reasons. And if it's 100 months, he says why it departs from that. Now, much of the time, perhaps, I don't know for sure, but of course you are referring to the guideline, and if the guideline is one thing, you might do A, and if it's another thing, you might do B. And certainly, you will have to say something different where the guideline is 100 versus 120, not certainly, but almost certainly. So why isn't that good enough? That's good enough to say that where the guideline is two levels lower, you know, you can get that advantage because your original sentence was in some sense based upon the guideline, namely the sense that I just mentioned. So I think this case is a really good example, Justice Breyer, of why that doesn't work. You are not going to know in particular cases what the parties would have done absent the guideline. So the, you know, he's All I have to know is what the judge would have done. He's the one who departed, and he had to put his, you know, I'd just be repeating what I said. So we know in every sentence like that, there will be words about the applicable guideline. Yes. And much of the time, it will have something to do with the applicable guideline, and why isn't that good enough? So, Justice Breyer, to take, for instance, this case, there is no reason to believe, I think, in this case, that the judge would have rejected the parties' plea agreement if the judge had calculated the guidelines differently. For instance, in this case, the particular change to the sentencing guidelines that the, you know, that was ultimately made had already been proposed. The parties knew about it, the judge knew about it, nobody indicated that that fact if that guideline's change had been in effect, the result would have been different. And here, I think there's good reason why the judge would have accepted this plea agreement, which was for a below-guideline sentence, even if the guidelines had been different, because the government was giving up a mandatory minimum in which the government could have assisted on a life sentence in this case. Breyer, Suppose we say, you're absolutely right, and that's why the word ''based upon'' cannot just refer to these hypotheticals we know nothing about. Therefore, ''based upon'' refers to an instance where the judge made significant use of the guideline, either in his reasoning or in the reasons that he gave, which, of course, would throw this case right into the opposite side that you want. But nonetheless, it would be a workable rule, and we'd say ''based upon'' at least means that. So I think there are a few reasons. First of all, we don't think respectfully that in the ordinary case it's going to be easy to sort out whether the court was just calculating the guidelines, which Petitioner suggests would not be enough, or which would not be enough. And a C agreement it would be, because he has to write it down. I think all he has to indicate is that there were justifiable reasons for him to accept the sentence, notwithstanding that the sentence in a particular case was outside the guidelines. And I think there are some additional reasons why that approach wouldn't be a good one. The first is the Sentencing Commission's guidance. The Sentencing Commission has indicated it has to be, in order for 3582 relief to be available, the guideline has to have actually been applied at sentencing. And then I think there's a stare decisis reason, which is the court, you know, whatever the merits of the rule in Freeman, and obviously the government took a slightly which 3582 denies relief. But this is an opinion of this Court that this plea and other pleas have been sort of organized around since the case was decided, and that's a case in which statutory stare decisis principles have their greatest force. So, I'm sorry, Your Honor. Roberts. I understand you'd like us to decide what we're calling the Marx question, rather than just resolving what Freeman means. But to what extent is the Marx problem real outside of the Freeman context? I know Freeman has beset the lower courts with a lot of difficulty and generated disagreements. But have there been real problems outside of that context? So, I mean, the courts that have gone against us on the Marx question have indicated it's sort of their – it's just their interpretation of Marx, so it's the interpretation they would apply in future. But they've done it in the context of trying to figure out what Freeman means. And if we relieve them of that confusion, how far have we gone to resolving the problem? I don't think very far, Your Honor, because in any future divided decision of this court, those courts would go back to applying their requirement. There are a lot of divided decisions of this court, though. That's right. And it doesn't seem to be a pervasive problem outside of the Freeman context, at least that you've documented so far. And I was just wondering whether you had any other evidence of problems outside of the Freeman context. So I think an additional circumstance, you know, some of the amicus briefs allude to is interpreting this Court's decisions in Rapanos. You know, we think this same issue comes up there, and, you know, the two circuits that have indicated shared reasoning is necessary, I think, would regard this Court's decision in Rapanos as not having precedential effect. And of course, as Your Honor alludes to, there are going to be, you know, future divided decisions of this court. But are there actual opinions, I guess, I'm sorry for pursuing this, but I'll stop. But are there any other actual decisions like we have in the Marx, in the Freeman context? This is often, I think, briefed in – I know there are a lot of cases discussing this Marx issue in the context of Rapanos. The opinions that I've focused on, I think, where this has been framed most are the Freeman cases. In part, that's because this is essentially a recent split. So Davis is 2016, and that's where the Ninth Circuit sets out its opinion. I think the D.C. Circuit case, it did arise earlier in one case that was King, and I think that – which obviously involved an interpretation of a different opinion of this Court. I think Your Honor is right that this split is framed most squarely in terms of Freeman. One of the circuits only arrived to its interpretation of Marx in the context of Freeman. But those courts have set out rules that are going to apply in future cases. Ginsburg. Didn't the commentary that's been referred to, Ray and the other one, give lots of examples? I think they – the Professor Ray's brief I take to indicate that – Not to read the long article. Yes. I take him to have identified cases where he asserts that this – there's been difficulty applying Marx in the past, so perhaps that supports the idea that there is benefit to be had from clarifying what the Marx rule means. It has been said that – and in one of the briefs – that the government in several cases endorsed this so-called Russian doll approach. Is that true that the government once did, and is the government giving it up now? No. I mean, in – I know in the cases interpreting Rapanos, the government has consistently taken the position we've interpreted here. Petitioners, I think, cite one of the petitions in – a petition we filed in a case called McWane, but my reading of that petition is that it's entirely consistent with our opinion here. We don't suggest – I'm not aware of any filing in which we've suggested that the Marx rule requires shared reasoning in order for a decision to have precedential effect. If we follow the – your predictive approach, why should we – could it not be confined to the opinions that concurred in the judgment? Why should we count the dissents? Why not just look at the – the ones that concurred in the judgment? So I take the Marx rule – I think that would be contrary to what this Court has said and done for about 40 years, where it said you identify the narrowest opinion concurring in the judgment, and then you treat that as the controlling rule, even though in some cases that opinion aligns with the dissent and in some cases with the plurality. And we think that's the right rule, Justice Alito, because otherwise in every Marx case, the Court would essentially need to take the case twice, once for the cases where the plurality aligns with the concurrence and once for the cases where the concurrence aligns with the dissent. And in that case, the members of this Court could issue identical opinions to the ones they issued in the first case, because all of the opinions have already fleshed out exactly what rule the justices are applying. But it would need to essentially – this Court would need to essentially take the case twice. The rule that was set out in the first case would depend somewhat arbitrarily on the vehicle on which the Court initially granted cert. We don't think there's any need for the Court to expend its resources in this way, and the effect would be an undesirable one for purposes of vertical stare decisis, where for a period of time you would have courts not being bound by what five members of the Court have indicated as the appropriate rule. Kennedy, as best you interpret the Wray brief and the Wray article, is it your position or would it be your position that overruling Marx would be disruptive? I think so, Your Honor. I mean, the Wray article points out that courts have – courts of appeals have relied on Marx quite a lot. There are over 400 decisions of courts of appeals applying Marx to over 100 decisions of this Court over a 40-year period. So we think there's quite a lot of appellate court jurisprudence that's based on applying Marx to this Court's decisions, so we think it would be quite disruptive to overrule Marx. But for the – you know, we believe Marx is the correct rule for the additional reason that the principles of vertical stare decisis that it embodies is, I think, the appropriate way for lower courts to adhere to this Court's decision. Breyer, Marx is fine for the cases that it works with, which are a logical subset fine, but it doesn't deal with every case. And we just recognize it doesn't. And as far as the other cases are concerned, we don't necessarily have to go into them. If we did have to go into them, you'd try to pick out something that is not an oxymoron, but it's something along the lines of legal common sense. And I don't know that I can do better than that. So, I mean, we agree that the Court doesn't need to consider or decide cases that are not before it, but we would urge the Court to clarify that there's no requirement of common reasoning and, you know, to go on and say, in this case, the lower court was correct to apply Marx to the straightforward application of Marx. If there are no further questions, we would urge that the judgment be affirmed. Thank you, counsel. Mr. Chomsky, three minutes. Thank you, Your Honor. Justice Sotomayor, I'd like to start with your hypothetical in a circumstance in which the prosecutor says the sentence here, the agreement here, was based on the guidelines. The lower courts following Freeman have interpreted the concurring opinion in Freeman as prohibiting reliance on that. And you can look at a case like United States v. Thompson. I'm not in disagreement with that, but the one thing your the Solicitor General's argument is that when a judge rejects a C agreement, the parties are put back to their starting point, which means the government keeps its right to file the persistent felony certificate or to prosecute the dismissed charges, or the charges it proposed to dismiss. In doing it this way, they don't get that chance anymore. Doing it the way the plurality suggests, they're losing that chance. Justice Sotomayor, let me try and address this as sharply as I can. This is where we started the colloquy at the beginning of this argument, and I think it's critical. The government is not losing the benefit of any bargain here, and it is certainly not in any greater way than it is for any other form of plea agreement. Well, you're turning it into a B instead of a C, is what you're saying. No. This is like all B agreements. Because, remember, we have other types of C agreements with a range, and the government says those ones are fine. We don't mind giving away the benefit of our bargain for C agreements with a range, because there, again, when Congress, in these narrow circumstances, has said the Commission, again, in narrow circumstances, is applying a change retroactively, under those circumstances, the bargain has changed. What was here is now here, and that's just the same for these agreements. I would emphasize that the record here shows that the judge, the parties, and the probation officer were discussing the sentencing guidelines at length. This is not just a circumstance in which they're being alluded to. At 32a to 36a of the record, they're performing a guidelines calculation. What about the three-point reduction for acceptance of responsibility? What about two points for using a gun? And it makes sense, under those circumstances, to send it back to the same district court who accepted the bargain and who had to, relying on section 6B1.2, assess the bargain. That is the critical thing about 6B1.2. Congress, when it enacted 994a2e, directed the Commission to put the judges in the middle of this process. The judges are assessing the agreement to determine whether it is compliant with the guidelines or at least compliant enough to be accepted. And so here we have a judge who sat there and dickered with the parties over the guidelines, and it only makes sense there to say this is a circumstance in which you are eligible to seek relief. You're not guaranteed to get it, but we're not closing the door. The final point I'd like to make on Freeman, Congress did not carve out C-type agreements. It could have. It knew how to do that. It did that in 3742 in limiting appeals, but it didn't do that for C-type agreements when it could have. Roberts. Thank you, counsel. The case is submitted.